UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

JAMES BOOKER,

       Defendant.

_____/

CASE No. 00-6047-CR-HUCK

MAGISTRATE JUDGE BROWN



## MOTION FOR BAIL

COMES NOW, the Defendant James Booker, by and through the undersigned counsel and files this motion for reconsideration for bail and states as follows:

1.      The Defendant voluntarily surrendered to customs agents on March 1, 2000.

2.      On March 6, 2000, a Pre-Trial Detention hearing was held as to Defendant Booker.

3.      At that hearing the Government argued that:

      a.      The primary basis for the Pre-Trial Detention hearing is Booker's danger to the community. (T. 22) [1]

      b.      Defendant Booker was kidnapped on February 28, 1997.

      c.      Defendant Booker stated on May 31, 1997, that "he could have taken them all out in one meeting."

      d.      Most critical thing for detention are Booker's statements of violence. (T. 27)

---

[1] References to "T" refer to the transcript of the bail hearing attached hereto as Exhibit A.

4.    The Court found that "the presumption of risk of flight had been rebutted by the Defendant based on his ties to the community." (T. 72)

a.    Defendant has lived in community all of his life with no prior arrests.

b.    Defendant's father has been employed by Florida Power and Light for over 25 years and is a practicing minister.

c.    Defendant's mother has been a Dade County school-teacher for 28 years.

5.    The Court then stated: "The Government has met its burden of showing a danger to the community."

## ARGUMENT

Unlike the summary of evidence presented at the Detention hearing on March 6, 2000, this Court has now heard the full breath of the government's case during a two (2) week trial of this matter. The Government's evidence consists of drug traffickers trying to save their own lives and a handful of wire intercepts that allegedly discuss marijuana.    It is also clear that this evidence was insufficient for a jury to determine the guilt of Mr. Booker.

The only evidence of any thought of violence is the alleged words of the Defendant, while bragging on a phone call. The Court should consider that the Defendant has no prior arrests, has no firearms which are registered to him, nor were any firearms found to be in his possession.

James Booker has now been in federal custody for 17 months without being convicted of any crime. All the remaining Defendants, including those defendants indicted in U.S. v. Lark, et al, were released on bail prior to trial. There is no evidence that Defendant Booker presents any danger to the community or risk of flight.    Conversely, the lack and sufficiency of the Government's case should convince this Court that bail is required.

CASE No. 00-6047-CR-HUCK

WHEREFORE, the Defendant prays that this Honorable Court grant reasonable bail to Defendant Booker.

Respectfully submitted,
GARY I. ROSENBERG

By: _____
Florida Bar No. 348996
MANICK, ROSENBERG & CONTRERAS LLP
Alhambra International Center
255 Alhambra Circle, Suite 425
Miami, Florida 33134
Tel: (305) 529-9330
Fax: (305) 529-9339

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was sent via U.S. mail/hand delivery/facsimile on this __11th__ day of July, 2001 to:   UNITED STATES ATTORNEY'S OFFICE, Michael Dittoe, Assistant United States Attorney and all counsel of record.

By: _____
GARY I. ROSENBERG
Florida Bar No. 348996

1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
2
FORT LAUDERDALE DIVISION

3

4

5
UNITED STATES OF AMERICA,           No.: 00-6047-CR-ZLOCH

6
                    Plaintiff,      March 6, 2000
                                    Fort Lauderdale, Florida
7
        v.

8
JAMES BOOKER et al.,

9
                    Defendants.



10
_____/

11

12
    TRANSCRIPT OF DEFENDANT BOOKER AND DEFENDANT DIXON'S
        PRETRIAL DETENTION HEARINGS AND ARRAIGNMENTS
13
            BEFORE THE HONORABLE LURANA S. SNOW,
                UNITED STATES MAGISTRATE JUDGE.
14

15
APPEARANCES:

16
For the Plaintiff:          MICHAEL DITTOE
17                          Asst. U.S. Attorney
                            Fort Lauderdale, Florida
18
For Defendant Archie:       MR. HOROWITZ, Esq.
19
For Defendant Knight:       JOEL ROBRISH, Esq.
20
For Defendant Booker:       DARYL WILCOX
21                          Asst. Federal Public Defender
                            Fort Lauderdale, Florida
22
For Defendant Dixon:        MR. ESPINOSA, Esq.
23

24
Transcriber:                S. Cullison

25

                    Accurate Reporting Services, Inc.
                            Third Floor
                    172 West Flagler Street
                    Miami, Florida  33130



2

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|

Mark Madenfort

    By Mr. Dittoe                                         49
                                                58 (resumed)
    By Mr. Wilcox                 30
    By Mr. Espinosa             44

Cassandra Lockhart

    By Mr. Dittoe       53
    By Mr. Wilcox                 55

E X H I B I T S

| | For ID | In Evidence |
|---|--------|-------------|

Plaintiff

  3   5-25-97 wiretap transcript       50           57

Accurate Reporting Services, Inc.
Third Floor
172 West Flagler Street
Miami, Florida  33130

3

1          THE CLERK:  Calling Case 00-6047-CR-ZLOCH,

2   United States of America vs. Shawn Dixon, James Booker,

3   Ernest Archie, and Jared Knight.

4          MR. DITTOE:  Good morning, Your Honor.  Mike

5   Dittoe on behalf of the United States.

6          Your Honor, there might be -- we might have a

7   joint recommendation to the Court with respect to the

8   Defendant Ernest Archie that might obviate the need for a

9   detention hearing.

10          THE COURT:  All right.

11          MR. DITTOE:  So, if it would be possible for the

12   Court to consider Mr. Archie first.  I say "might,"

13   because I have been in discussions with Mr. Horowitz, and

14   I don't know if we have arrived at a joint recommendation

15   yet or not.

16          MR. HOROWITZ:  Judge, I need about 60 seconds to

17   speak with my client, if I may.

18          THE COURT:  Go ahead.  Take your time.

19          MR. DITTOE:  We appreciate the indulgence of the

20   Court.

21          (Mr. Horowitz and Defendant Archie conferring off the

22   record.)

23          THE COURT:  Where is Mr. Knight?  Mr. Knight,

24   how are you doing on -- have you got your lawyer here?

25          MR. ROBRISH:  Judge, good afternoon.  My name is

4

1    Joel Robrish, and I am filing -- may I file a temporary

2    appearance at this time?

3            THE COURT:  Yes.

4            MR. ROBRISH:  I would like to file a temporary

5    appearance on behalf of Mr. Knight.  I am sure it will be

6    a permanent appearance, but at this particular point --

7            I also might suggest -- I am sorry I am a bit

8    tardy, but according to the documents that we received

9    from Miami, this was supposed to start at 11:30.  And I

10   beg the Court's indulgence and forgiveness for being late,

11   but it said 11:30.  So --

12           THE COURT:  Well, it is five of 12:00, and we

13   just now called it.  So, you are not late.

14           MR. ROBRISH:  Well, in any event, we would have

15   had some time to speak to the prosecutor, perhaps, about

16   this matter.  I did review the pretrial sentence report,

17   however.  And we are --

18           THE COURT:  Do you all want a few minutes to

19   talk about this?

20           MR. DITTOE:  That could be helpful, Your Honor.

21           THE COURT:  And as far as the other defendants

22   are concerned, too.  I mean, I am not suggesting anything,

23   but --

24           MR. DITTOE:  I understand.  I think we

25   definitely will be going forward with detention -- I know

```
 1   we will be going forward with a detention hearing on Mr.
 2   Booker and Mr. Dixon as well.  With regard to --
 3              THE COURT:  Mr. Knight.
 4              MR. DITTOE:  With regard to Mr. Knight, some
 5   discussions might be helpful, although I am not
 6   optimistic.
 7              MR. ROBRISH:  Well, Judge, discussions are
 8   always, you know, a good first step.
 9              THE COURT:  I agree.  I don't mind taking a few
10   minutes.  So, we will take -- well, why don't you just
11   knock on the door when you have concluded your
12   discussions.  And we will be in recess for --
13         (Whereupon, a recess was taken.)
14              THE COURT:  -- earthquake, for anyone who is
15   concerned.  There is a building getting built across the
16   street.
17              UNIDENTIFIED SPEAKER:  They took away our little
18   parking -- over there too.
19              THE COURT:  I know.  Sorry.
20              UNIDENTIFIED SPEAKER:  So, we have to pay $6.00
21   an hour --
22              THE COURT:  Well, you can bring a lot of
23   quarters next time.  There are meters.
24              All right.  I understand there are stipulations
25   as to two.
```

6

1          MR. DITTOE:  That is correct, Your Honor.  There

2    is a joint recommendation on -- we will first, if it is

3    all right, do Jared Knight.

4          Just so the Court is aware, the Government's

5    theory is that Jared Knight is more culpable than Ernest

6    Archie.

7          Jared Knight was involved in cocaine

8    importations and supplied the container number, according

9    to the Government's theory of the case, where the cocaine

10   was located.

11         Frankly, his criminal record concerns me some,

12   even though there is only one conviction.  He was on

13   probation at the time of his arrest.  However, in all

14   honesty --

15         MR. ROBRISH:  The time of his arrest when?

16         MR. DITTOE:  -- I could not say that the crimes

17   were actually committed --

18         MR. HOROWITZ:  That is Mr. Archie.

19         MR. DITTOE:  I am sorry.  I am sorry.  I take

20   that back.  I apologize.  He does have prior arrests,

21   but --

22         In any event, the joint recommendation to the

23   Court would be a 50,000 corporate surety bond, together

24   with a 200,000 personal surety bond, with a nebbia on the

25   corporate surety bond, and the 2,000 personal surety bond

1    being co-signed by the defendant's mother, the defendant's

2    father, and the defendant himself.

3            And that would be the joint recommendation.

4            MR. ROBRISH:  Judge, that is agreeable with Your

5    Honor.

6            And I asked Mr. Dittoe what he needs for a

7    nebbia.  He said, if I send the documents and he reviews

8    them and approves them, that we could just call chambers.

9    Is that the way that you do it?

10            THE COURT:  That is true.  I don't like nebbia

11    hearings if I can avoid them.  So, I am very happy --

12            MR. ROBRISH:  Well, if I can call chambers that

13    we have got a stipulation, that will be sufficient.

14            THE COURT:  Absolutely.  Actually you call

15    Penny, because --

16            MR. ROBRISH:  Penny.  Okay.

17            THE COURT:  -- she will -- she is 769-5403.

18            MR. ROBRISH:  Can I give you my card?  And do

19    you have a --

20            THE COURT:  All right.  Are his parents here in

21    court or no?

22            MR. ROBRISH:  Yes, ma'am.  They are right here.

23    Come --

24            THE COURT:  All right.

25            MR. ROBRISH:  Can they come forward, Your Honor,

8

1    or --

2          THE COURT:  They can, but then Mr. Knight needs

3    to step aside for the --

4          MR. ROBRISH:  Why don't you sit down over there.

5    Folks, come forward.

6          DEFENDANT KNIGHT:  My mother-in-law --

7          MR. ROBRISH:  No, no, no.  Just dad.  Dad is a

8    retired postal worker, Your Honor.

9          THE COURT:  All right.  I think I have met his

10   father earlier.

11         All right.  Would each of you raise your right

12   hands, please.

13              (DEFENDANT KNIGHT'S WITNESSES SWORN)

14         All right.  Part of the bond that is being set

15   is a $200,000.00 personal surety bond which you are being

16   asked to sign.

17         That part of the bond will not require that any

18   money be put up with the court or with a bondsman.

19   However, if your son is notified that he must appear in

20   court and he should deliberately fail to appear, then his

21   bond would be revoked, and the Government would sue you

22   for $200,000.00.

23         As long as he makes his court appearances and

24   abides by the terms and conditions of his bond, you won't

25   ever have to pay anything, but you do have that liability

9

1  if his bond is revoked.  Do you each understand that?

2           MR. KNIGHT:  I understand.

3           MRS. KNIGHT:  Yes.

4           THE COURT:  Are you willing to sign?

5           MR. KNIGHT:  Yes.

6           MRS. KNIGHT:  Yes.

7           THE COURT:  All right.  Thank you.  You may have

8  a seat, both of you.  And --

9           All right.  Mr. Knight, then your bond -- you

10  may come back -- your bond is set in the amount of

11  $50,000.00 corporate surety with a nebbia condition

12  attached.

13          That part of the bond will require that a

14  bondsman be involved, and a premium will be paid to the

15  bondsman.

16          And a nebbia hearing means that your lawyer

17  needs to satisfy the Government that the money did not

18  come from any illegal source.  As long as it is money that

19  was legally obtained, it will survive the nebbia hearing.

20          The $200,000.00 personal surety part, which you

21  just heard, will be required -- it will be required that

22  your parents sign, as well as yourself.

23          If you come to court when you are supposed to

24  and you abide by your bond conditions, nobody has to pay

25  anything on that bond.

1        But if it is revoked because you failed to

2    appear or because you violated some condition of bond,

3    then the Government would sue your parents for

4    $200,000.00, as well as yourself.  Do you understand?

5        DEFENDANT KNIGHT:  Yes, I do.

6        THE COURT:  All right.  Your travel is

7    restricted to the Southern District of Florida, which goes

8    from Vero Beach to Key West.

9        If you need to leave South Florida, Mr. Robrish,

10    or whoever is representing you permanently, will need to

11    file a motion to get permission to travel outside the

12    district.

13        Do you have a passport, Mr. Knight?

14        DEFENDANT KNIGHT:  No, I don't.

15        THE COURT:  All right.  My usual reporting

16    conditions are once a week by telephone and once a month

17    to Pretrial Services in person.  Is that acceptable?

18        MR. ROBRISH:  Very acceptable.

19        MR. DITTOE:  Yes, it is, Your Honor.

20        And we would also request that the Court impose

21    no firearms on all the defendants.

22        MR. ROBRISH:  Of course.

23        THE COURT:  All right.  Mr. Knight, if you have

24    any firearms, please give them to someone to hang onto

25    while this case is pending.  Do not have them in your

11

1    house, your car, or your place of business.  Okay?

2              DEFENDANT KNIGHT:  Yes.

3              THE COURT:  All right.  Mr. Robrish, how much

4    time do you need to see if you are going to be permanent?

5              MR. ROBRISH:  Judge, would a week be a

6    sufficient amount of time?  I am sure by a week I will

7    have absolute knowledge.

8              THE COURT:  Any problem with that, Mr. Dittoe?

9              MR. DITTOE:  No, Your Honor.

10             THE COURT:  All right.  I will set it for

11   arraignment a week from today.  That will be March 14th?

12             THE CLERK:  13th.

13             THE COURT:  13th.  Is that all right?

14             MR. ROBRISH:  -- my book, Judge.

15             THE COURT:  Go ahead.

16             MR. ROBRISH:  Mondays are usually a bad day

17   because of commitments in state court with trial

18   calendars, Judge.  That is --

19             THE COURT:  Just take a look at that.

20             MR. ROBRISH:  If we could -- Monday, the 13th.

21   Could we do it Tuesday, the 14th?  Would that be --

22             THE COURT:  I don't see why not.  It will be --

23             MR. ROBRISH:  And probably before that, I will

24   just file my appearance, but I am confident that is --

25             THE COURT:  Well, you have to come anyway,

12

1    because --

2            MR. ROBRISH:  Set a trial date?

3            THE COURT:  -- you can't enter a written

4    arraignment notice.  So --

5            MR. ROBRISH:  Correct.

6            THE COURT:  A written plea of not guilty.

7            So, Tuesday, the 14th, at 11 o'clock before

8    Judge Seltzer on the first floor.

9            MR. ROBRISH:  Judge, thank you very much.

10           THE COURT:  All right.  So, Mr. Knight, you need

11   to come back next Tuesday.  It will be on the first floor

12   before Judge Seltzer.

13           If you have hired Mr. Robrish, he will come with

14   you for arraignment.  If you are unable to make permanent

15   arrangements, then Judge Seltzer will take testimony to

16   see if you qualify for court-appointed counsel.

17           MR. ROBRISH:  Thank you, Your Honor.

18           DEFENDANT KNIGHT:  Thank you.

19           MR. ROBRISH:  Thank you.

20           THE COURT:  All right.

21           All right.  We will take -- is it Mr. Archie?

22           MR. HOROWITZ:  Yes, Your Honor.

23           MR. DITTOE:  That is correct, Your Honor.

24           Your Honor, just to give you a very brief

25   background on Mr. Archie, unlike the Defendant Jared

1   Knight, Mr. Archie is involved in the conspiracy only

2   insofar as it relates to marijuana and an importation of

3   approximately 2,500 to 3,000 pounds of marijuana on May

4   the 24th of 1997.

5           What frankly concerns me is that the defendant

6   was on probation at the time of his arrest.  However, I

7   cannot in all honesty say he committed the instant offense

8   while he was on probation.

9           However, as Your Honor is aware, the statute

10  does say the mere fact that someone is arrested while on

11  probation is a factor that should be considered.

12          But, in any event, given the defendant's

13  substantial ties to the community and his comparative low

14  level of culpability in the overall conspiracy, we are

15  jointly recommending a 75,000 10-percent cash bond to be

16  signed by the defendant's uncle and aunt, who, by the way,

17  have --

18          And this is all contingent upon the

19  representation that the defendant's uncle and aunt own a

20  home with a substantial equity.  The equity is believed to

21  be $250,000.00.  So, all this would be dependent upon

22  proof that in fact that house would have that much equity

23  in it -- our recommendation.

24          But 75,000 10-percent cash signed by the uncle

25  and the aunt, and then a $400,000.00 personal surety bond

14

1    signed by the defendant's uncle and aunt and also by the

2    defendant's parents and by the defendant's fiancée.

3            And with regard to the uncle, we would want a

4    special condition on the bond that the house not otherwise

5    be encumbered and that a model --

6            UNIDENTIFIED SPEAKER:  I wouldn't worry about

7    the car.  Just the house is the main thing.

8            MR. DITTOE:  Okay.  That the house not otherwise

9    be encumbered.

10            THE COURT:  Are the aunt and uncle here?

11            MR. HOROWITZ:  They are not here, Your Honor.

12    But his mother, his father, and his fiancée, Runette

13    (phonetic) Brown, who are going to be cosignatories on the

14    personal surety bond, are present.

15            THE COURT:  All right.  How will we -- I think

16    they will need some verification on the equity.

17            MR. HOROWITZ:  Judge, I will get --

18            THE COURT:  Where are the aunt and uncle?  Where

19    do they live?

20            MR. HOROWITZ:  His uncle is at work at the port,

21    and his aunt we have attempted to contact this morning and

22    have been unable to.  But their daughter is here, who

23    is -- Mr. Archie's first cousin is present.

24            THE COURT:  All right.  Does she have

25    information about the value of the house and the market?

1          MR. HOROWITZ:  Yes, Judge.

2          THE COURT:  Okay.  All right.

3          I don't think that the 10-percent bonds have

4     provisions for signatures.  But you have got them on a

5     $400,000.00 personal surety bond.  So, I don't know that

6     it really matters.  Is that --

7          MR. DITTOE:  No, that does not matter, Your

8     Honor.

9          THE COURT:  All right.  Mr. Archie, bond will be

10    set in two parts.

11         One is a $75,000.00 10-percent bond.  That part

12    of the bond will require that $7,500.00 be placed in the

13    registry of the court.

14         However, if you come to court when you are

15    notified to appear and you abide by the terms and

16    conditions of your bond, when the case is over, that money

17    will be returned to whoever -- well, to you, to return to

18    whoever posted it, with whatever interest it has earned

19    during that period of time.

20         The $400,000.00 personal surety bond does not

21    require that any money be put up with the court or with a

22    bondsman.  However, your parents, your fiancée, and your

23    aunt and uncle will be signing it along with you.

24         And if you were to fail to appear on this case

25    after having been notified to appear, the $7,500.00 would

16

1   be forfeited, and all of the people who signed the bond

2   could and likely would be sued for $400,000.00.  So, your

3   aunt and uncle's property would be forfeited.

4            But if you make your court appearances and abide

5   by your bond conditions, you won't have to worry about

6   that.

7            I will also direct that you report to Pretrial

8   Services once a week by telephone and once a month in

9   person and that you not possess any firearms while this

10  case is pending.

11           So, if you have any firearms, please give them

12  to someone else to hold for you until the case is over

13  with.

14           MR. DITTOE:  Judge, we would also request a

15  nebbia on the bond, which I think will probably be able to

16  be satisfied just by a presentation to the U.S. Attorney's

17  Office.

18           MR. HOROWITZ:  That is fine, Judge.

19           THE COURT:  What?  On the 10-percent part?

20           MR. DITTOE:  Yes.  Yes, Your Honor.

21           THE COURT:  Okay.  A nebbia condition as to the

22  10-percent, and I will accept a stipulation.

23           MR. HOROWITZ:  Thank you, Your Honor.  Oh --

24           THE COURT:  Let me have whoever you have here

25  who is going to sign, as well as the daughter -- or, his

17

1    cousin, the daughter of the aunt and uncle who are going

2    to --

3            All right.  I will ask each of you to raise your

4    right hands, please.

5                    (DEFENDANT ARCHIE'S WITNESSES SWORN)

6            All right.  I assume that the lady and gentleman

7    closest to the microphone are Mr. Archie's parents?

8            MRS. ARCHIE:  Yes.

9            THE COURT:  And one of the two young ladies in

10   the back is his cousin and one is his fiancée.  You are

11   the cousin?  And you are the fiancée.  Okay.

12           The part of the bond that concerns each of you

13   is the $400,000.00 personal surety bond.

14           Let me have your name --

15           MS. BROWN:  Runette.

16           THE COURT:  I am sorry?

17           MS. BROWN:  Runette.

18           THE COURT:  Runette.

19           MS. BROWN:  Umm-hmm.

20           THE COURT:  Runette, you are not going to be

21   signing a bond, but you are just going to be telling me

22   something about your parents' home.

23           MS. BROWN:  Okay.

24           THE COURT:  Do you know how much it is worth

25   about?

18

1          MR. HOROWITZ:  Judge --

2          MS. BROWN:  That's for the cousin; right?

3          MR. HOROWITZ:  That is the --

4          THE COURT:  Oh, I have got it backwards.  I am

5     sorry.

6          MR. HOROWITZ:  You have got it backwards, Your

7     Honor.

8          THE COURT:  I don't know why I bothered to ask.

9     Okay.  You are -- tell me your name.

10          MS. F. ARCHIE:  Felicia Archie.

11          THE COURT:  Felicia?

12          MS. F. ARCHIE:  Archie.

13          THE COURT:  All right.  Ms. Archie, it is your

14     parents then.

15          MS. F. ARCHIE:  Right.

16          THE COURT:  Do you know how much the home is

17     worth?

18          MS. F. ARCHIE:  About 250,000.

19          THE COURT:  250,000.  And what is the address?

20          MS. F. ARCHIE:  260 Northwest 77th Street.  It's

21     in Miami.

22          THE COURT:  Okay.  And do you know if your

23     parents still have a mortgage on it?

24          MS. F. ARCHIE:  No.  I don't live with them.

25     So -- I gave the lawyer a phone number.  He can call and

19

1    contact them.  But I don't -- I'm not sure --

2            THE COURT:  You are not sure?

3            MS. F. ARCHIE:  No.

4            MR. HOROWITZ:  Judge, I know they have been

5    living in the residence for 21 or 22 years.

6            THE COURT:  Okay.  Do you need any -- well, we

7    have a nebbia to satisfy anyway.  So, if you want to check

8    with the parents, we will do that and do it at the same

9    time.

10           MR. DITTOE:  Yes, Your Honor, we would request

11   that.

12           THE COURT:  All right.  Ms. Archie, you may have

13   a seat.  That is all I really need from you.

14           And the remaining three of you, it is a

15   $400,000.00 personal surety bond.  As long as Mr. Archie

16   comes to court when he is supposed to, when he is notified

17   to appear, then none of you will be liable on the bond.

18           But if he were deliberately to fail to appear,

19   then his bond would be revoked, and his aunt and uncle

20   would probably lose their house, and the Government would

21   sue each of you for $400,000.00 as well.

22           Do you each understand that is what --

23   essentially you are vouching for his appearance in court

24   in the amount of $400,000.00.

25           MRS. ARCHIE:  Just his appearance in court?

1          MR. ARCHIE:  Yeah.

2          MRS. ARCHIE:  Okay.

3          THE COURT:  His appearance in court.  Well, his

4   bond could get revoked if he were to use drugs or get

5   involved in another crime or something like that.  So, you

6   are going to have to keep an eye on him.

7          The bond requires that he stay in the Southern

8   District of Florida, which is Vero Beach to Key West, that

9   he report to our Pretrial Services Office by telephone and

10  once a month in person, and that he not commit another

11  crime.  And the use of an illegal drug is another crime.

12         So, I am not saying they would sue you for

13  $400,000.00 if he smoked marijuana, but that is a

14  possibility.  So, you need to understand that.

15         Generally the bond is forfeited and people are

16  sued if the person doesn't show up, but if he were to get

17  arrested for something else, they might.

18         Do you understand that, all of you?

19         MRS. ARCHIE:  Yes.

20         MR. ARCHIE:  Yeah.

21         THE COURT:  Are you willing to sign?  Sir, are

22  you willing to sign the bond?

23         MR. ARCHIE:  Yes, ma'am.

24         THE COURT:  Okay.  The record will reflect that

25  all three have answered in the affirmative.

1          But I think, since the aunt and uncle have the

2   property, we will delay release until they sign, until the

3   nebbia has been satisfied.

4          THE CLERK:  I need him to sign both of them.

5       (Counsel and the clerk conferring off the record.)

6          THE COURT:  All right.  Mr. Dittoe, we can

7   proceed on the remaining two defendants.

8          MR. DITTOE:  Thank you very much, Your Honor.

9          Initially I would just observe that the

10  indictment charges a fairly massive conspiracy to import

11  controlled substances through Port Everglades,

12  specifically cocaine and marijuana.

13         And the Defendant Booker is the lead defendant

14  in that indictment.  The Defendant Booker is named in each

15  and every count of the indictment.

16         The Defendant Shawn Dixon, the Government's

17  testimony would be, worked for Mr. Booker and assisted Mr.

18  Booker in importing the controlled substance.

19         Mr. Booker, in turn, worked closely with Cecil

20  McLeod, who is cooperating with the United States and

21  indeed testified at a related trial this summer.

22         The Defendant Shawn Dixon is charged only in

23  Counts 1 through 4, Counts 1 and 2 being conspiracy

24  charges, Counts 3 and 4 being a substantive importation of

25  approximately 87 kilograms of cocaine.

1          The bulk of the evidence in the case consists of

2   Title 3 intercepts against Mr. Booker, corroborated by

3   testimony of cooperating witnesses.

4          With respect to Mr. Shawn Dixon, it consists

5   primarily of cooperating witnesses, corroborated by

6   telephone toll records.

7          Mr. Dixon was not intercepted on the Title 3;

8   however, he was discussed on the Title 3.

9          Now, at the outset, I recognize the possible

10  incongruity in seeking pretrial detention on Mr. Booker,

11  given the fact that Mr. Booker voluntarily surrendered.

12         However, the primary basis of pretrial detention

13  in this instance is the defendant's danger to the

14  community.

15         And there are conversations intercepted

16  indicating a propensity toward violence.  And Shawn

17  Dixon -- and I will get into the specific conversation in

18  a second.

19         Shawn Dixon also has no appreciable criminal

20  record, although he was charged with an aggravated assault

21  on October 13th of 1991, and the case was dropped shortly

22  thereafter, on November 1 of 1991.

23         However, at the time of Shawn Dixon's arrest,

24  Shawn Dixon was found in possession of a loaded Tech-9,

25  which was in his closet at the place of arrest.  And in

23

1    addition to that, there were two extra magazines that were

2    also fully loaded.  So, the defendant was in possession of

3    a loaded firearm at the time of his arrest.

4         The conspiracy overall was responsible for in

5    excess of 800 kilograms of marijuana and really in excess

6    of 1,000 kilograms -- the indictment charges 800, but the

7    evidence would show that it was in excess of 1,000

8    kilograms during the course of the conspiracy -- and

9    several thousands of pounds of marijuana, well over 10,000

10   pounds.  One load itself was 10,000 pounds.

11        So, the defendants both are facing substantial

12   periods of incarceration.

13        THE COURT:  How much cocaine?

14        MR. DITTOE:  Over 1,000 kilograms, Your Honor,

15   during the course of the conspiracy.

16        THE COURT:  Of cocaine?

17        MR. DITTOE:  Of cocaine.  Yes, ma'am.

18        THE COURT:  Okay.

19        MR. DITTOE:  And over 10,000 pounds of

20   marijuana.

21        And as I said, the Defendant Booker is charged

22   in all 14 counts.  In addition, there are other

23   importations and distributions that are not charged, that

24   we would present as evidence of the conspiracy during

25   trial.

1          Briefly, the evidence about the cocaine part of

2    the conspiracy consists primarily of the testimony of

3    cooperating witnesses, including Cecil McLeod and others,

4    as corroborated by telephone toll records.

5          A wiretap was obtained on the Defendant Cecil

6    McLeod's phone in May of 1997, and as a result of that,

7    there was a recorded conversation concerning an

8    importation of about 2,500 pounds of marijuana.  And so,

9    the Title 3 conversations that I am going to be referring

10   to relate to that importation of marijuana.

11         And specifically -- I will briefly summarize it.

12   And we, of course, have obtained an order authorizing the

13   use of those conversations.  It was signed by Judge

14   Ferguson, without providing -- essentially waiving the

15   10-day requirement in 18 USC 25189.

16         On May 19th of 1997, there was a court-

17   authorized interception between McLeod and Booker, and in

18   that conversation Booker and McLeod discussed the fact

19   that they were ready to put something together, and McLeod

20   would testify that this refers to an importation of

21   marijuana.

22         Then on February the 28th of 1997, which is, of

23   course, before the intercept, the evidence would be that

24   the Defendant Booker was essentially kidnapped by certain

25   Jamaican nationals, who were the owners of about 9,474

1  pounds of marijuana that had been seized.

2          The Jamaican nationals, the evidence would be,

3  did not know or did not believe that the marijuana had

4  been seized by the Customs Service, and they thought that

5  Booker was responsible essentially for taking or stealing

6  the marijuana and then falsely telling the owners of the

7  marijuana that the marijuana had been seized by the

8  Customs Service.

9          Mr. Booker, of course, worked with Cecil McLeod

10  at Port Everglades and used his position to smuggle

11  narcotics.

12          That is the background behind an interception

13  that occurred on May the 25th of 1997 between the

14  Defendant McLeod and the Defendant Booker, and in that

15  conversation, referring to the incident about the

16  kidnapping, Booker says, "I could have taken them all out

17  in one meeting.  I could have taken every one of them out

18  in one meeting."

19          Mr. Booker continues on and says, "I told you

20  what I did.  I strapped down that (expletive) and

21  eliminate (expletive) things you've got to do."

22          And so, he is, I believe --

23          MR. WILCOX:  Excuse me, Your Honor.  Can I ask

24  him to fill in the expletives, because, I mean, I need it

25  to figure out what he is saying my client did.

26

1           THE COURT:  Well, if he doesn't want to say it,

2    he can show you the transcript.

3           MR. DITTOE:  I would be happy -- the word begins

4    with "mother" and --

5           MR. WILCOX:  Well, I mean, I need to hear it in

6    the context --

7           THE COURT:  Oh, come on, Mr. Wilcox.  You can

8    look at his transcript if he doesn't want to say it.

9           MR. DITTOE:  And then the Defendant Booker

10   refers to the fact that he was angry -- the fact that the

11   Jamaican nationals were "putting my family and my men out

12   there," meaning putting them at risk or in danger.

13           And the importance of that conversation is, of

14   course, it demonstrates an intent essentially to kill

15   people as a result of a narcotics transaction, or a

16   reasonable inference could be derived from that.

17           And also, the reference to putting his men and

18   family out there is putting his men and family in danger.

19   The significance of that is --

20           The evidence would be that Shawn Dixon was one

21   of the people that worked closely with Booker, kind of did

22   errands, that sort of thing, for the Defendant Booker.

23           And then at the time Shawn Dixon was arrested,

24   Shawn Dixon was found in the possession of a Tech-9 with

25   two loaded clips.

1          There are subsequent conversations on May the

2     29th of 1997 related to the importation of the narcotics,

3     which occurred on May the 24th of 1997.

4          The agents attempted to interdict the narcotics,

5     but were mistaken, and the narcotics ended up getting into

6     the United States.

7          Then there is a subsequent conversation, again a

8     Title 3 intercept, on May 31st of 1997, in which the

9     subject of the importation of the narcotics is again

10    discussed, and subsequent conversations on May 31 of '97

11    and also on June the 9th of 1997, in which Booker and

12    McLeod are discussing the distribution of the narcotics.

13         That would be essentially the case against Mr.

14    Booker.  The most critical thing for detention again being

15    the references to violence on the May 25th, 1997

16    intercept.

17         Shawn Dixon was also a worker at Port

18    Everglades.  He was also, like Mr. Booker, a member of

19    Teamsters Local 390.  He also worked at Crowley

20    (phonetic).

21         Shawn Dixon is a resident alien.  He was born in

22    the United Kingdom.  And he does have a green card

23    allowing him to work in the United States, which was

24    issued approximately 10 years ago.

25         The defendant assisted in the importation of

1    narcotics on January the 18th of 1996, which was an

2    importation of 87 kilograms of cocaine.

3            And in that instance, Shawn Dixon -- his role

4    was to serve as lookout, and he conducted counter-

5    surveillance while Mr. Booker, along with the others, were

6    going to go in and actually remove the cocaine, the others

7    being Cecil McLeod.

8            Now, there is also evidence that Shawn Dixon was

9    going to be involved in the importation of marijuana that

10   occurred in May of 1997, and that evidence is also a Title

11   3 intercept between Booker and McLeod, in which McLeod

12   essentially says that he has lost two people, he has lost

13   Hawk and he has lost Dread.

14           And the testimony would be, according to McLeod

15   and other cooperating witnesses, that Dread was a nickname

16   that was used for Shawn Dixon, indicating that Shawn Dixon

17   was going to be part of that deal but was unavailable to

18   actually participate in that importation.

19           The testimony of the cooperating witnesses

20   concerning the cocaine importation is all corroborated by

21   telephone toll records showing contacts between McLeod's

22   phone and Dixon's phone on or about the time the

23   importations were to occur.

24           Frankly, but for the discovery of the Tech-9 in

25   the defendant's residence at the time of arrest, the

1    Government would probably be recommending some type of

2    corporate surety or 10-percent cash bond.

3           But the presence of the Tech-9, coupled with the

4    linkage between Booker and Shawn Dixon and the intercept

5    involving violence, is the reason the United States is

6    seeking pretrial detention, in addition to the length of

7    incarceration the defendants are facing.

8           THE COURT:  All right.  Do you have an agent

9    available for cross?

10          MR. DITTOE:  Yes, Your Honor.  Special Agent

11   Mark Madenfort is the case agent on this particular part

12   of the case.

13          THE COURT:  All right.  I assume -- Mr. Wilcox,

14   did you wish to cross-examine?

15          MR. WILCOX:  I was going to allow Mr. Espinosa

16   to go first, but I will go ahead if the Court wishes.

17          THE COURT:  Well, either one of you can go

18   first.

19          MR. ESPINOSA:  You can go first --

20          THE COURT:  I just need to know whether to swear

21   the agent.

22          MR. WILCOX:  All right.  Yes, please.

23          THE COURT:  Okay.

24      (MARK MADENFORT, GOVERNMENT'S WITNESS, SWORN)

25          THE CLERK:  State your name and spell your last

30

1    name for the record, please.

2            THE WITNESS:  Mark Madenfort, M-a-d-e-n-f-o-r-t.

3            THE COURT:  Please have a seat.

4            Agent, did you hear the Government's proffer in

5    support of the request for detention?

6            THE WITNESS:  Yes, I did.

7            THE COURT:  Are prepared to adopt it as your

8    direct testimony?

9            THE WITNESS:  Yes, I am.

10           THE COURT:  Do you have any changes that you

11   wish to make?

12           THE WITNESS:  No.

13           THE COURT:  All right.  Mr. Wilcox, you may

14   cross.

15                        CROSS-EXAMINATION

16   BY MR. WILCOX:

17   Q    Excuse me.  Agent, would you state your name again

18   for me, please.

19   A    Mark Madenfort, M-a-d-e-n-f-o-r-t.

20   Q    Madenfort?

21   A    Madenfort.

22   Q    Agent Madenfort, now Paragraph 7 of the general

23   allegations indicates that Mr. Booker is a member of the

24   Teamsters Local 390.  Do you know that for a fact?

25   A    That Mr. Booker had worked for --

31

1  Q    No.  Is a member.  Is he a teamster?

2  A    He worked at Crowley.

3  Q    No.  Let me be very specific.  The indictment alleges

4  that Mr. Booker is a teamster, that he uses his influence

5  as a teamster to make these drug deals happen.  That is

6  what it says.

7         MR. DITTOE:  Objection, Your Honor, unless there

8  is a specification as to the time.  I mean, the --

9         MR. WILCOX:  Well --

10        THE COURT:  Sustained.  Time and place.

11 BY MR. WILCOX:

12 Q    Was he a teamster in 1996?

13 A    Uh, I --

14 Q    You don't know; do you?

15 A    I really don't know whether he was a teamster in

16 1996.

17 Q    Okay.  You don't know if Mr. Booker was ever a

18 teamster; do you?

19 A    No, I don't, sir.

20 Q    So -- in fact, Mr. Booker is not a teamster.  Mr.

21 Booker is what is called a casual laborer.

22 A    Yes, sir.

23 Q    That is what he is.

24        THE COURT:  If you know.  Do you know one way or

25 the other?

1     THE WITNESS:  I do know that he has done some

2   casual work, because in the investigation leading up to

3   Mr. Booker's arrest, we were told that he was a casual

4   laborer.

5   BY MR. WILCOX:

6   Q    Now, a casual laborer -- and I am going to try to

7   make this simple.  Basically a casual laborer, if you are

8   working with the longshoremen, is someone that goes to the

9   longshoremen hall in the morning.  He waits around.  If

10  there is work for him to do, he goes to work -- if there

11  is work for him to do.

12  A    Yes.

13  Q    Right.  I mean, it is not like he is controlling who

14  works where or who is assigned to this position or who is

15  assigned to this position.  He doesn't run anything.  He

16  is hoping to get a job when he shows up in the morning.

17          MR. DITTOE:  Objection.  It calls for a

18  conclusion.  Relevance.

19          MR. WILCOX:  If he knows.

20          THE WITNESS:  A casual laborer is somebody that

21  goes and works at the port.  As far as what type of

22  influence he has on the comings and goings of anybody

23  else, I have no idea.

24

25

1  BY MR. WILCOX:

2  Q    Okay.  Good.  You don't have any idea whether or not

3  he has any control over telling or making sure people work

4  in certain areas on certain days.

5  A    No, that wouldn't be that position.

6  Q    No.  And in fact, that is not his position.

7  A    Being a casual laborer, no, that wouldn't be his

8  position.

9  Q    Right.  That is probably the lowest thing that you

10  can be at the port.

11  A    I have no knowledge about that.

12         MR. DITTOE:  Objection of relevance.

13         THE COURT:  Sustained.

14         MR. WILCOX:  Your Honor, their indictment

15  specifically alleges that Mr. Booker used his influence as

16  a teamster member to control --

17         THE COURT:  Well, I am just sustaining as to the

18  very last question.  If you want to ask it a different

19  way, you can try.

20         MR. WILCOX:  Okay.

21  BY MR. WILCOX:

22  Q    So, that part of the indictment as far as him using

23  his influence as a teamster union would just be false.

24         MR. DITTOE:  Objection, Your Honor.  I apologize

25  for objecting in this fashion, but counsel is mis-stating

1  the allegations in the indictment.

2          It says that the teamster membership was used to

3  facilitate.  There are no words about that he would

4  control the teamsters.  There are allegations about the

5  teamsters union controlling.

6          But it says "facilitate," and that is -- the

7  question is, therefore, inherently vague and mis-states

8  the allegations in the indictment.

9          THE COURT:  Sustained.

10 BY MR. WILCOX:

11 Q    How does one use their position as a teamster to

12 facilitate these drug deals?

13 A    One could use a position working at the port to

14 facilitate the drug deals -- where the drugs are coming

15 in.

16 Q    I mean -- so, just so we are accurate here, you

17 say -- you feel that his membership in the teamsters,

18 which he is not, facilitated that use.

19 A    No.  What I'm saying is working at the port

20 facilitate -- or, gives you the possibility of

21 facilitating the drug importation, because obviously

22 there's been a lot of drugs seized at the port and you

23 have access to the drugs coming in.

24 Q    But he was only a casual laborer.

25          MR. WILCOX:  I am going to move on, Your Honor.

35

1    THE COURT: All right.

2  BY MR. WILCOX:

3  Q    Now, you say that -- let me understand this.  Do you

4  have wiretaps or a taped conversation with Mr. Booker and

5  Mr. McLeod that specifically relates to cocaine

6  transactions?

7  A    No, that's not what was said.

8  Q    I am asking.  I am asking do you have that.

9  A    Specifically cocaine?

10  Q    Right.

11  A    No.

12  Q    No.  So, you don't have any tapes with Mr. Booker and

13  Mr. McLeod discussing matters that specifically relate to

14  cocaine transactions.

15  A    To drug trafficking, yes.

16  Q    No.  I am not asking about drugs.  I am going to get

17  to marijuana.

18    MR. DITTOE:  Objection, Your Honor.  The

19  question has been asked and answered.

20    THE COURT:  All right.  Let's ask another

21  question, Mr. --

22    MR. WILCOX:  All right.

23  BY MR. WILCOX:

24  Q    So, the tapes that you are referring to specifically

25  refer to marijuana transactions.

1    A    Yes.

2    Q    Okay.  Now, with regard to the marijuana

3    transactions -- now -- and I tried to write everything the

4    prosecutor said.  But I believe you said that there were

5    conversations in March of '97 and May of '97.

6    A    Not March of '97, May of '97.

7    Q    Just May of '97.  How many tapes do you have of Mr.

8    Booker talking about marijuana transactions?

9    A    Several tapes.

10   Q    Can you round that off for me.

11   A    Several.  Four or five.

12   Q    Less than five?

13   A    Four or five on that specific time frame of right

14   around May 24th, 1997, give or take two weeks.

15   Q    Over a two-week time period, you say you have tapes

16   of Mr. Booker talking about a shipment of marijuana coming

17   into the port with Mr. McLeod.

18   A    Yes.

19   Q    And only Mr. McLeod.

20   A    No.  The tapes we have -- the T-3 was on Mr. McLeod's

21   phone.  So, Mr. McLeod is going to be involved in the

22   conversation obviously.

23   Q    How many tapes do you have with Mr. Booker's

24   involvement?

25   A    Like I said, several.  Four or five.

37

1   Q    Okay.  Do you know if Mr. McLeod has ever been to Mr.

2   Booker's house?

3   A    I have no personal knowledge, no.

4   Q    Okay.  Now, how much did Mr. McLeod pay Mr. Booker

5   for his role in the scheme?

6   A    How much did he pay him?

7   Q    Right.

8   A    I'm not really sure.

9   Q    You don't know if he paid him anything.

10  A    I know Mr. McLeod's testimony, Mr. McLeod's

11  statements.

12  Q    And Mr. McLeod stated to you that he paid Mr. Booker

13  what?

14  A    In that particular transaction, Mr. Booker supposedly

15  got 45 pounds of marijuana for his own personal use.

16  Q    And what is the street value of 45 pounds of

17  marijuana?

18  A    It could be anywhere up to $45,000.00.

19  Q    Okay.  $45,000.00 for 45 pounds of marijuana?

20  A    Yeah.  I'm not an expert on the street price, but

21  somewhat in that area.

22  Q    I am going to defer to your knowledge.  I mean, I am

23  not an expert either.

24  A    $1,000.00 a pound.

25  Q    Okay.  Now -- and this happened in 1997 --

38

```
 1    A    Right.

 2    Q    -- that he paid this $45,000.00 to Mr. Booker?

 3    A    I didn't say that.

 4    Q    Well, what did you say?

 5    A    I said he gave him 45 pounds of marijuana.

 6    Q    Oh, 45 pounds of marijuana.  In 1997.

 7    A    Right.

 8    Q    Did Mr. McLeod tell you where he gave him the

 9  marijuana at?

10    A    No.

11    Q    Okay.  So, you don't know where Mr. Booker actually

12  retrieved this 45 pounds of marijuana.

13    A    Mr. Booker was in control of the marijuana during

14  that time.

15    Q    You don't know where he received it, though.  You

16  don't know where he gained --

17    A    No.

18    Q    -- custody or control of this --

19    A    A specific location, no.

20    Q    Okay.  In fact, there is no evidence putting Mr.

21  Booker -- or any tapes or any surveillance where Mr.

22  Booker is in possession of any narcotics.

23    A    I'm not following the question.

24    Q    You don't have any video surveillance putting Mr.

25  Booker in possession of any narcotics.
```

39

1   A    No, there's no video.

2   Q    Okay.  And all the evidence you have where Mr. Booker

3   is in possession of any narcotics is this testimony from

4   Mr. McLeod, who is a convicted trafficker.

5   A    No.  Off the T-3 tapes, Mr. Booker, during the course

6   of the conversations, is in possession.  It's brought up.

7   Q    Exactly what did he say that would lead you to

8   believe that he is in possession of marijuana?

9   A    What he said was "I need some more of the good stuff,

10  not the bad stuff."  And I apologize to Your Honor.  I

11  don't have those words specifically, but that was the

12  general gist of the thing -- because he needed some

13  more -- he stated to Mr. McLeod he needed some more

14  marijuana and, not the bad stuff, the good stuff.

15  Q    He didn't use the word "marijuana."  You are saying

16  "bad stuff" and "good stuff."  He didn't say "marijuana."

17  A    No, he didn't say "marijuana."

18  Q    Okay.  I mean, that is you assuming that is what he

19  meant.

20  A    Well, if you look at the totality of the tapes, it's

21  pretty easy to figure that out.

22  Q    Okay.  Did you do a financial check of Mr. Booker,

23  like check into like, you know, whether he has got some

24  unexplained income or anything like that?

25  A    Mr. Booker has got a home, a reasonable home, nothing

40

1   ostentatious or anything.

2   Q    Let me just cut right to it.  So, did you do a check?

3   Did you check to see if he had -- did you check his

4   lifestyle out at all?

5   A    We've done drive-by surveillance.  We know where he

6   lives, his family -- basics on his family.

7   Q    Okay.  Is there any -- based on your surveillance of

8   him, is there anything about his lifestyle that would

9   support this participation in this massive drug scheme --

10  bank accounts, the type of house, the type of car he

11  drives?

12  A    That would be making a conclusion on my part.  I

13  don't feel that I can make that conclusion.  There's

14  various ways to hide your money, put it somewhere else.  I

15  have no idea.

16  Q    All right.  It doesn't appear that he spent the drug

17  money in the house.

18  A    Does he have a $2-million house?  No.  Does he drive

19  in a Rolls Royce?  No.

20  Q    Okay.  So, you haven't found any outward signs of him

21  dealing in drugs; right?

22  A    Well, if you go according to the phone calls and

23  testimony and T-3 tapes, yeah, he is dealing in drugs.

24  Q    I am talking about based on his lifestyle.

25  A    Off of his lifestyle, you really can't tell.  A lot

1    of the people involved in the drug business, as soon as

2    they get the money, it goes right out the window.

3    Q    Have you seen any of his money go out the window?

4              MR. DITTOE:  Objection, Your Honor.

5              THE WITNESS:  Have I specifically seen it go out

6    the window?  No.

7              MR. WILCOX:  Okay.

8              THE COURT:  Overruled.

9    BY MR. WILCOX:

10   Q    Now, as far as this Jamaican kidnapping, did you ever

11   verify that through any other sources, other than Mr.

12   McLeod and this phone call?  I mean, did you arrest the

13   Jamaicans?

14   A    No.

15   Q    Have you talked to the Jamaicans?

16   A    No.

17   Q    Do you know who the Jamaicans are?

18   A    No.

19   Q    Okay.

20             MR. WILCOX:  I am sorry, Your Honor.  Just give

21   me a couple more minutes.

22             THE COURT:  All right.

23   BY MR. WILCOX:

24   Q    Now, you have talked a lot about phone calls.

25   Apparently you had Mr. McLeod's phone taped.  Did Booker

42

```
 1    ever call McLeod or was McLeod always calling Booker?

 2    A    Both.

 3    Q    Both.  How many times did Booker call McLeod?

 4    A    Uh --

 5    Q    And you have got evidence of this.

 6    A    Yes.

 7    Q    Okay.

 8    A    Right.  McLeod called Booker most of the time.  I'd

 9    say Booker called McLeod 10-15 times.

10    Q    Ten or fifteen times in March of '97 or --

11    A    No.  Over the course of the wiretap and also over the

12    course of going back and getting phone tolls.

13    Q    Just so I am clear, now, the course of the wiretap

14    was from what period?

15    A    May 17th of '97 through July 17th of '97.

16    Q    Okay.  And you are certain that in July of '97 there

17    are phone calls between Mr. McLeod and Mr. Booker.

18    A    That's not --

19         MR. DITTOE:  Objection, Your Honor.  That is

20    mis-characterizing the witness's prior testimony.

21         MR. WILCOX:  I am just asking.

22         THE WITNESS:  In July?  That's not part of the

23    indictment, to the best of my knowledge.  July --

24

25
```

43

BY MR. WILCOX:

1  Q    Excuse me?

3  A    Mr. Booker isn't being indicted or charged on
4  anything after May of '97.

5  Q    Okay. And the only tapes that you have are of this
6  incident that occurred in May of '97.

7  A    The only tapes that are being brought in to this
8  indictment, yes.

9  Q    Okay. With regard to the cocaine allegation in 1996,
10 exactly what was Mr. Booker's role? What did he do to
11 help import cocaine into the United States?

12 A    Mr. Booker helped offload the cocaine.

13 Q    And how so?

14 A    Well, working at the port, he had access to go into
15 the container and bring the cocaine out of the container.

16 Q    I am asking you what he did.

17 A    I just told you. He went into the container.

18 Q    Well, did he drive the crane that took the container
19 off the ship?

20 A    As I said before, he went in with other members of
21 the conspiracy, removed the cocaine from the container,
22 and took it that way.

23 Q    Okay. I am just trying to make sure -- where was the
24 container when he would go in and take the cocaine out of
25 the container?

44

1   A    Normally sitting on the ground somewhere in one of

2   the yards at the port.

3   Q    So, it was already off the ship.

4   A    Yeah.

5   Q    Okay.  Now, do you know what Mr. Booker usually did

6   when he went to the port?

7   A    I believe Mr. Booker did some driving, but as a

8   casual laborer, I guess he was open to doing whatever they

9   told him to do.

10  Q    Whatever who told him to do?

11  A    Whoever was his supervisor at the time.

12  Q    And who was his supervisor?

13  A    I have no idea.

14          MR. WILCOX:  I don't have anything else, Your

15  Honor.

16          THE COURT:  All right.  You may cross.

17          MR. ESPINOSA:  Yes, Judge.  Thank you.

18                      CROSS-EXAMINATION

19  BY MR. ESPINOSA:

20  Q    Good afternoon, Agent.

21  A    Good afternoon.

22  Q    Now, you mentioned that -- were you involved in the

23  actual arrest of Mr. Dixon?

24  A    No, I wasn't.

25  Q    So, you were not involved in handling this gun that

1   they found at his house?

2   A   No, I wasn't.

3   Q   Okay.  But you are aware that he did advise

4   whoever -- the law enforcement agents that went to his

5   house that he had a weapon in the house.

6   A   I'm not aware of that, sir.

7   Q   Okay.  And did they also tell you that the gun wasn't

8   actually loaded?

9   A   I was told that the gun was loaded.

10   Q   Okay.  It is not illegal for anyone to own a gun;

11   correct?

12   A   No, not someone who isn't a convicted felon.

13   Q   Okay.  And he is not a convicted felon.

14   A   No.

15   Q   You checked his background; correct?

16   A   Right.

17   Q   So, it is perfectly legal for him to have had a gun

18   at the house.

19   A   Yes.

20   Q   And the gun wasn't modified to make it illegal in any

21   ways; correct?

22   A   Correct.

23   Q   It was just a regular gun.

24   A   Well --

25   Q   It was a gun.

46

1    A    It was a gun.

2    Q    Okay. And you have no evidence to suggest that he

3    ever used that gun in any type of case; correct?

4    A    Correct.

5    Q    With regards to the wiretap, you mentioned there were

6    wiretaps of Mr. McLeod's phone number; correct?

7    A    Correct.

8    Q    And there was no wiretapped conversation with Mr.

9    Dixon; correct?

10    A    Correct.

11    Q    And there was no tape-recorded conversation, let's

12    say, by Mr. McLeod of Mr. Dixon; correct?

13    A    Mr. Dixon speaking to Mr. McLeod?

14    Q    Correct.

15    A    No.

16    Q    How about any wiretaps of Mr. Dixon speaking to any

17    agents?

18    A    Not to my knowledge.

19    Q    How about any videotapes of Mr. Dixon doing anything

20    illegal?

21    A    Not to my knowledge.

22    Q    So, basically what you have is the word of Mr.

23    McLeod; correct?

24    A    Correct.

25    Q    And nothing else.

1    A    Correct.

2          THE WITNESS:  Your Honor, could I —— I want to

3    add ——

4          THE COURT:  Do you wish to explain your last

5    answer?

6          THE WITNESS:  Yes, I wish to explain ——

7          MR. ESPINOSA:  Yes.  That is fine.  You can go

8    ahead and explain.

9          THE WITNESS:  Okay.  We have statements from

10   other individuals besides Mr. McLeod implicating Mr.

11   Dixon.

12   BY MR. ESPINOSA:

13   Q    And who would those individuals be?

14   A    Several other people that were involved in the

15   conspiracy.

16   Q    And what are their names?

17          MR. DITTOE:  Judge, I am going to object at this

18   point.  That would be ——

19          THE COURT:  Sustained.

20   BY MR. ESPINOSA:

21   Q    Now, the allegations against Mr. Dixon, as they

22   appear in the indictment, are from May of —— excuse me ——

23   January of 1996?

24   A    Yes.

25   Q    Were there any drugs seized as a result of any of the

48

1   acts allegedly committed by Mr. Dixon?

2   A    Not that specific incident, no.

3   Q    Okay.  You mentioned that the wiretaps mention a guy

4   named Dread -- several conversations of the wiretaps.

5   A    Correct.

6   Q    They talk about a guy named Dread.

7   A    Correct.

8   Q    They don't talk about a guy named Dixon; correct?

9   A    Correct.

10  Q    They don't talk about a guy named Shawn.

11  A    Correct.

12  Q    They don't give any other identification about this

13  guy Dread, other than the word "Dread"; correct?

14  A    Correct.

15  Q    You have no evidence to suggest that Mr. Dixon is a

16  member of the teamsters union; do you?

17  A    No.

18       MR. ESPINOSA:  May I have a second to discuss

19  with my client?

20       THE COURT:  You may.

21  (Mr. Espinosa and Defendant Dixon conferring off the

22  record.)

23  BY MR. ESPINOSA:

24  Q    Would you agree that the term "Dread" is normally

25  used to identify individuals that come from Jamaica?

49

1    A    Or somebody that might have dreadlocks.

2    Q    Okay.  All right.  And you did verify his background.

3    He was born in England; correct?

4    A    Right.

5    Q    And he has been here for over 20 years; correct?

6    A    I believe 10 years.

7    Q    No.  Then did you really check his background?

8    A    I specifically didn't, no.  I just was informed it

9    was 10 years, but I could be wrong on that.

10   Q    You could be wrong on that.  Okay.  I appreciate

11   that.

12            MR. ESPINOSA:  All right.  Thank you.

13            THE COURT:  Redirect.

14            MR. DITTOE:  Yes, Your Honor.

15                    REDIRECT EXAMINATION

16   BY MR. DITTOE:

17   Q    Now, Agent, with regard to the charged substantive

18   counts in the indictment where Mr. Booker is charged with

19   importing cocaine, do you know whether or not there are

20   telephone toll records that show contact between the

21   Defendant Booker and Cecil McLeod on or about each of the

22   substantive charges contained in the indictment?

23   A    Yes, there are.

24   Q    And in addition to the witness Cecil McLeod, there

25   are other witnesses that establish the involvement of both

50

1    Booker and Shawn Dixon in the importation scheme.

2              MR. WILCOX:  Object to the leading, Your Honor.

3              MR. DITTOE:  I will rephrase the question, Your

4    Honor.

5              THE COURT:  All right.

6    BY MR. DITTOE:

7    Q    In addition to Cecil McLeod, can you please tell us

8    whether or not there are other witnesses who would be

9    prepared to testify concerning the involvement of Booker

10   and Shawn Dixon in the importation of controlled

11   substances.

12   A    Yes, there are.

13   Q    Now, prior to coming into court today, did you review

14   the transcripts of the Title 3 conversations that we

15   discussed?

16   A    Yes, I did.

17   Q    I am showing you what has been marked for purposes of

18   identification as Government's Exhibit No. 3.  What is

19   that?

20   A    It's a copy of one of the transcripts.

21   Q    Is that an accurate representation of the

22   conversation?

23   A    Yes, it is.

24             MR. DITTOE:  The Government would move into

25   evidence Government's Exhibit No. 3, a transcript of a

1    conversation of May the 25th, 1997.

2                THE COURT:  Any objection?

3                MR. WILCOX:  Your Honor, I am objecting to the

4    foundation as to how we know this is actually Mr. Booker's

5    voice that they are -- that appears on the tape.  I mean,

6    we haven't had any foundation whatsoever with regard to

7    that.

8                THE COURT:  All right.  Lay your predicate, Mr.

9    Dittoe.

10                MR. DITTOE:  Yes, Your Honor.

11   BY MR. DITTOE:

12   Q    How were the voices identified and placed upon the

13   transcript?

14   A    The voices were identified by asking some of the

15   people involved in the conversations who the other voice

16   was.

17   Q    And the voice that appears in the transcript, is it

18   Mr. McLeod's voice?

19   A    Yes, it is Mr. McLeod's voice.

20   Q    How do you know that?

21   A    Because I've -- Mr. McLeod admitted that that was

22   him.  The wiretap was on his phone.  And subsequently

23   showing Mr. McLeod the transcripts, he said, "Yes, that's

24   my voice."

25   Q    Now, with regard to the identification of Booker as

52

1    the speaking party, are you aware of whether or not

2    Agent -- well, just tell me, How was Booker identified as

3    the speaking party on this transcript, if you know.

4    A    I believe Mr. McLeod identified Booker and several --

5    I'm not positive, but I think several other of the

6    coconspirators also identified Mr. Booker.

7        MR. DITTOE:  Your Honor, these hearings are

8    somewhat informal, but at the same time I understand the

9    need for a question and answer.

10        Could I make a statement to the Court about the

11   identification of the voice, just to clarify something?

12        THE COURT:  All right.

13        MR. DITTOE:  This voice was ID'd as Booker not

14   by Cecil McLeod, but rather by other law enforcement

15   agents who are familiar with the voice of Mr. Booker and

16   compared that tape with other tapes that Mr. McLeod did

17   identify that did belong to Booker.

18        And I could call a law enforcement agent -- I

19   could call, for example, Agent Cassandra Lockhart for that

20   limited purpose.  She is the one that actually identified

21   the voice as belonging to Mr. Booker.

22        But that is the way the identification was made.

23        THE COURT:  Any objection to the proffer?

24        MR. WILCOX:  Yes, Your Honor, because there is

25   no evidence whatsoever that any police officer at any time

53

1    spoke to Mr. Booker prior to these tapes being made and

2    would know what Mr. Booker's voice sounds like.  I mean --

3              THE COURT:  All right.  Agent, you can stay

4    right where you are.  Why don't you just stand up, and you

5    may question her.

6              Raise your right hand.

7         (CASSANDRA LOCKHART, GOVERNMENT'S WITNESS, SWORN)

8              All right.

9                       DIRECT EXAMINATION

10   BY MR. DITTOE:

11   Q    Agent Lockhart, are you familiar with the voice of

12   Mr. Booker?

13   A    Yes.

14   Q    And how are you familiar with that voice?

15   A    Based on other conversations, as well as

16   conversations that Mr. McLeod had ID'd as being Mr.

17   Booker -- that the voice of Mr. Booker was identified

18   specifically for that phone call.

19   Q    Now, did you listen to this telephone conversation

20   that we are referring to in Government's Exhibit No. 3,

21   the transcript of May 25th, 1997?

22   A    Yes, we did, at the time that the interception was

23   made during May and also again most recently about two

24   weeks ago to verify the voices.

25   Q    Based upon your familiarity with the voice, who was

54

1    the speaking party on this conversation?

2    A    Both speaking parties were that of Mr. McLeod and Mr.

3    Booker.

4    Q    Now, initially, just so there is no

5    misunderstanding -- initially was a transcript

6    misidentified and attributed the speaking party to a Mr.

7    Box?

8    A    That's correct.

9    Q    Now, after that misidentification, did you listen to

10   the tape recording and did you arrive at a determination,

11   based upon your own listening, as to who the speaking

12   party was?

13   A    Yes, myself along with Agent Leary.

14   Q    And who are the speaking parties again on

15   Government's Exhibit No. 3?

16   A    Mr. Cecil McLeod and Mr. James Booker.

17   Q    Have you ever -- during the arrest -- were you

18   present for the arrest of Mr. Booker?

19   A    No, I was not.

20   Q    Okay.  Did you ever question Mr. Booker?

21   A    I spoke briefly to Mr. Booker at the time he was

22   being -- well, actually, biographical information was

23   being obtained from him at the office.

24   Q    And did you have occasion to listen to his voice when

25   you were obtaining the biographical information?

1   A    Well, I was kind of used to the voice, being that we

2   had listened to the tape several times.

3   Q    Were you actually taking the interview of Mr. Booker

4   or was someone else?

5   A    No.  Actually I just stepped in at the time that he

6   was being questioned on his biographical information and

7   so forth.

8   Q    Okay.

9           MR. DITTOE:  No further questions, Your Honor.

10          THE COURT:  All right.  Do you wish to cross-

11  examine the agent?

12          MR. WILCOX:  Yes, ma'am.

13                    CROSS-EXAMINATION

14  BY MR. WILCOX:

15  Q    Briefly, ma'am.  Now, the reason that you were able

16  to identify Mr. Booker's voice in the first place -- let

17  me rephrase that.

18          The first time you heard this voice that the

19  Government is now trying to say belongs to Mr. Booker was

20  on a wiretap, and Cecil McLeod identified it as being Mr.

21  Booker; is that right?

22  A    Well, that was -- on several of the calls, he

23  identified.  And there were calls in which Mr. Booker has

24  a nickname of Book, based on those conversations and

25  interceptions.  Mr. McLeod did verify on particular calls

56

1   of Mr. James Booker.

2   Q    All right.  But that is what I am saying.  I mean,

3   prior to Mr. McLeod even mentioning the name James -- I

4   mean, Mr. Booker or anything like that, I mean, you had

5   not heard Mr. Booker's voice.

6   A    Not prior to the interception.

7   Q    I see.  All right.  And at some point after the

8   interceptions, Mr. McLeod identified that voice on certain

9   tapes as being Mr. Booker.

10  A    That's correct.

11  Q    And then you are saying that after you heard Mr.

12  Booker speak in the police station, you feel that the

13  voice that you heard in the police station during the time

14  he was giving background information matched the voice

15  that you heard on the tape.

16  A    That's not correct.  We had heard -- along with other

17  tapes that were being intercepted and tapes that we had

18  listened to through the course of the investigation -- we

19  compared the voice of Mr. Booker to this call.  And based

20  on that, along with the other calls, that has Mr. Booker's

21  voice on it.  That's how we identified it.

22  Q    Let me ask you this.  You got several calls of the

23  same voice; is that right?

24  A    That's correct.

25  Q    And apparently you got several calls, and this voice

1   on this tape was the same person.  You could tell that.

2   A    Yes.

3   Q    Okay.  But as far as that same person being the one

4   Mr. Booker on each time, the only information you have

5   regarding that is what Mr. McLeod told you.

6   A    Basically he was the person that identified, because

7   that was the person he was talking to.

8   Q    So, I mean -- basically what I am saying -- you are

9   not saying that you have heard Mr. Booker speak and you

10  can tell that that is his voice.

11  A    Only through the intercepted phone calls, where we

12  identify his voice compared to other calls.

13          MR. WILCOX:  I don't have anything else, Your

14  Honor.

15          THE COURT:  You are not concerned.

16          MR. ESPINOSA:  No cross-examination.

17          MR. DITTOE:  All right.  Your Honor, the

18  Government at this point moves into evidence Government's

19  Exhibit No. 3.

20          THE COURT:  All right.  Any further objection?

21          MR. WILCOX:  I am going to object, Your Honor,

22  for the record.

23          THE COURT:  All right.  Objection overruled.

24          MR. DITTOE:  Very well.

25

58

REDIRECT EXAMINATION (Resumed)

BY MR. DITTOE:

Q    Agent Madenfort, could you please turn to Page 10 of
the transcript.

THE COURT:  Have you marked it, Mr. Dittoe?

MR. DITTOE:  Yes, ma'am, I have.

THE COURT:  As what, Exhibit 1?

MR. DITTOE:  Actually Exhibit 3.  And --

THE COURT:  That is all right.  I just --

MR. DITTOE:  -- I should have been --

THE COURT:  No.  It is just -- I want the record
to reflect what it is.  It is 3.

MR. DITTOE:  Right.  It is Exhibit 3.  I
pre-marked a bunch of exhibits, Your Honor, and --

THE COURT:  I figured that out.  Yes.  Okay.

MR. DITTOE:  Okay.

MR. WILCOX:  What page are we on?

MR. DITTOE:  Page 10.

BY MR. DITTOE:

Q    Could you turn to Page 10, sir?

A    Yes, sir.

Q    Now, toward the end, specifically about the fourth
line from the end, does Mr. Booker say to Mr. McLeod, "I
could have gotten mine all in one meeting.  You know what
I'm saying."  Does he say that?

1    A    Yes.

2    Q    And does Cecil McLeod ask, "Say that again," and does

3    Mr. Booker respond, "I -- uh -- I could have taken

4    everybody out in one meeting"?

5    A    Yes.

6    Q    Okay.  Continuing on to the bottom of Page 11 -- and

7    this is a verbatim quote -- does Mr. Booker say the

8    following?

9         "I told you what I did.  I put it up -- put in

10    up in the m-f'ers -- eliminate the m-f'ers, this being

11    you.  You got to do what you got to do.  I'm going to take

12    care of my business.  Plus, that n-word put me out

13    there -- me and my men and my family."

14    A    Yes.

15    Q    Based upon your review of the entire conversation,

16    what is your understanding as to what Mr. Booker is saying

17    on Page 10 when he says, "I could have taken everybody out

18    in one meeting," and on Page 11 when he says, "I could

19    have eliminated the m-f'ers"?

20    A    It seems to me like he's speaking about killing some

21    people or he could have killed the people.

22    Q    Now, do you recall questions by defense counsel

23    concerning seized narcotics?

24    A    Refresh my memory.

25    Q    Certainly.  Were there narcotics seized during the

60

1    course of this investigation?

2    A    Yes.

3    Q    Okay.  And specifically if we could just briefly go

4    through it.  And if you need to consult any notes, that is

5    fine.

6              But on the importation on January the 18th of

7    1996, in which Shawn Dixon was involved, was there any

8    cocaine seized on that importation?

9              Please, if you need to --

10   A    -- my notes.  January 18th?

11   Q    Yes, sir.

12   A    No, there was none seized.

13   Q    Now, on Count 5, March 6th of 1996, involving Mr.

14   Booker, was there a seizure of 91 kilograms of cocaine?

15   A    Yes, there was.

16   Q    On April the 5th of 1996, involving importation of

17   marijuana, was there a partial seizure of 40 pounds of

18   marijuana?

19   A    Yes, there was.

20   Q    And then, skipping the ones where there were no

21   seizures, going to September 1st of 1996, was there a

22   seizure of 575 kilograms of marijuana?

23   A    September 1st?

24   Q    Of 1996.

25   A    575 kilos of cocaine.

61

1   Q    Of cocaine.  I am sorry.  I said marijuana.

2   A    Yeah.  Cocaine.

3   Q    My fault.  Of cocaine.  Was there a seizure --

4   A    Yes.

5   Q    -- of 575 kilos of cocaine?

6        On February 28th of 1997, was there a seizure of

7   9,474 pounds of marijuana?

8   A    Yes, there was.

9   Q    Are you aware of whether or not the Defendant Shawn

10  Dixon took any trips --

11       MR. DITTOE:  Just one moment, Your Honor.

12  BY MR. DITTOE:

13  Q    Are you aware of whether or not --

14       MR. ESPINOSA:  -- object at this point.  This is

15  beyond the -- I won't be able to cross-examine this

16  witness about any additional information.  It is beyond

17  the scope.

18       THE COURT:  I didn't hear the -- well, he hasn't

19  asked the question yet.

20       MR. DITTOE:  I withdraw the previous question.

21       THE COURT:  All right.

22  BY MR. DITTOE:

23  Q    With regard to Mr. Booker, are you aware of whether

24  or not he has taken any trips or vacations outside of the

25  United States?

1    A    I'm not aware of that, sir.

2    Q    Okay.  And one more question concerning -- defense

3    counsel asked you some questions concerning payment.  Are

4    you aware of whether or not Mr. Booker was paid $25,000.00

5    on January of 1996 for his participation in that smuggling

6    venture?

7    A    Yes.

8    Q    And how much -- you said he was paid 25,000?

9    A    25,000.

10   Q    Is it your understanding -- last question, regarding

11   the Tech-9.  Is it your understanding that the Tech-9 was

12   loaded?

13   A    That's what I observed in the report.

14   Q    And why is that your understanding?  I lied.  One

15   more question.  How do you know that?

16   A    From the officer on the scene's report.  He stated it

17   was loaded.

18           MR. DITTOE:  No further questions, Your Honor.

19           THE COURT:  All right.  Thank you, Agent.  You

20   may step down.

21           Anything further from the Government?

22           MR. DITTOE:  No.

23           THE COURT:  All right.  Any evidence, testimony,

24   or proffer on behalf of Mr. Booker?

25           MR. WILCOX:  Judge, I have a proffer --

1          THE COURT:  All right.

2          MR. WILCOX:  -- on behalf of Mr. Booker.

3          First of all, Judge, as I was alluding in cross-

4    examination, Mr. Booker is not a teamster.  Mr. Booker is

5    what is called a casual laborer, Judge.

6          When he wakes up in the morning, he has no idea

7    what job he is going to be called on to perform when he

8    gets to Port Everglades or the Port of Miami.

9          He has worked for two -- basically he works out

10   of two places.  He works out of Crowley, and he works out

11   of the longshoremen hall.  Sometimes Crowley calls him in

12   to work.  Sometimes the longshoremen -- sometimes he goes

13   to work with the longshoremen.

14         Basically, Your Honor, Mr. Dixon is -- most of

15   the time he is a driver.  He did not start out as a

16   driver.  Now he is a driver.

17         Basically he started out as a person that ties

18   and chains.  He was a tie-chain person.  Basically that

19   person goes and just ties crates down on the boat, Your

20   Honor.

21         Your Honor, Mr. Dixon -- Mr. Booker -- I

22   apologize -- you can read the Pretrial Services report.

23   He owns a $76,000.00 house.  He has a beat-up truck, Your

24   Honor.  He has a truck that is worth maybe $500.00.

25         There is absolutely no evidence whatsoever that

64

1    Mr. Booker is some type of drug dealer or heading some

2    type of drug ring.

3          I mean, his lifestyle is just inapposite to

4    suggest that, Judge.  There is nothing in his lifestyle

5    that will support these allegations in the Government's

6    indictment.

7          He is $40,000.00 in debt, mostly because he is

8    behind on his mortgage and he has credit cards.

9          As far as his ties to the community, Your Honor,

10   he has lived here all his life.  He graduated from Norland

11   High School in 1985, Your Honor.

12         He bowls.  He goes out and bowls quite

13   frequently.  He's a good bowler.

14         His whole family is here, Your Honor.  If I can

15   just ask them to stand up -- all of his family members.

16   Your Honor, here are three of his sisters up front.

17         Here is his mother.  Here is his father, who is

18   a minister, who works at Florida Power & Light, Your

19   Honor.  He has worked at Florida Power & Light in excess

20   of 25 years.  His mother has been in the Dade County

21   school system for over 28 years as a teacher's assistant.

22         There is his wife, Your Honor.  He has three

23   children.  He has substantial ties.

24         He has no criminal record, Your Honor.  He has

25   no criminal convictions.

65

1          The case against him, Judge, is just rank

2    hearsay by a convicted drug trafficker.

3          Your Honor, I have not seen the tapes -- I mean,

4    I have not heard all the tapes, but the tape in which -- I

5    don't know if this is Mr. Booker's voice.

6          But, Your Honor, this tape certainly does not

7    show that Mr. Booker participated in any marijuana scheme.

8    I mean, that certainly doesn't prove that in a -- doesn't

9    conclusively prove that or infer that.

10          To me, it just shows that he was involved in

11    some kind of incident where he got mad at some people.   I

12    just don't see how the Government can show this tape and

13    just start linking things together like there is some kind

14    of marijuana conspiracy and that he got kidnapped.

15          There certainly wasn't anything in there to

16    suggest that he was mad because he had been kidnapped.

17    And Your Honor, we submit that no kidnapping ever

18    occurred.

19          Your Honor, there is nothing to indicate he is a

20    danger to the community, other than this tape, and we

21    certainly aren't aware of the circumstances to that.

22          As I have said, Your Honor, he has got

23    substantial ties to the community.  His mother and father,

24    they own their own house, Your Honor.  I believe it is

25    worth about $90,000.00, totally paid for.

Accurate Reporting Services, Inc.
Third Floor
172 West Flagler Street
Miami, Florida  33130

66

1          Certainly, Your Honor, in light of his strong

2     ties to the community and in light of the fact that he has

3     no criminal record and that the case against him is

4     basically just going to be people that have already been

5     convicted and are looking to reduce time off their own

6     sentences, we would ask that the Court fashion some

7     conditions of bond that Mr. Booker can meet.

8          Your Honor, he still works at Crowley and --

9     well, at the longshoremen he still works, Your Honor.

10         We would ask that the Court set a 10-percent

11    bond and maybe a high personal surety bond, with his

12    mother and his father co-signing, as well as his sisters

13    who are here in court.

14         You are free to question any of his family

15    members if you so desire.

16         THE COURT:  Okay.  Yes.  Any evidence or proffer

17    on behalf of Mr. Dixon?

18         MR. ESPINOSA:  Yes, Your Honor.  Thank you.

19         Your Honor, my client is not a teamster.  He

20    does work at the port, similar to what Mr. Booker does.

21    He basically ties down containers when they arrive -- when

22    they are ready to be shipped.

23         My client has lived in this community, Your

24    Honor, for -- he has been a United States resident -- I

25    would like to clarify that -- for over 20 years.

67

1        He has been in the United States Army.  He
2   received a general discharge from the United States Army.
3        His children live here in the United States.
4   Right now he is involved in a custody battle over one of
5   his children.
6        And he did work at Crowley.  Hopefully he can
7   still work at Crowley if released, Your Honor.
8        He lives with his fiancée.  Her name is Rebecca
9   Mathis.  Can you stand up.  Right over here, Your Honor.
10       Her father is present.  He owns -- he has been a
11  member of this community.  He owns a home here.  He is
12  willing to pledge that home.
13       And then we also have his mother, who is sitting
14  right over here.  Can you stand up.  Your Honor, she was
15  born in England.  Mr. Dixon was born in England.  They
16  practically -- he came over when he was a kid.
17       This is his ties to the community, Judge.  And
18  we have also cousins -- a sister right here and a cousin
19  over here, Judge.
20       He has no ties to England, Judge.  His father
21  does live in England, but I don't think he has ever had
22  any contact with his father that he can remember.
23       The case against him is a very weak case, Judge.
24  Basically, they have a wiretap with somebody talking about
25  a guy named Dread -- something that happened in January of

1    1996, Judge.

2             Now, if he was involved in crime and if the

3    Government felt that he was really involved in crime, why

4    didn't they follow him around since 1996?

5             I am sure by now they could have found something

6    on him.  They could have found that he did something

7    wrong, he was involved in the marijuana or the cocaine

8    trade.  They could have put videos at the port.

9             But this man has been working there for eight

10   years, and they never found any evidence that he committed

11   any crimes, Judge.  He has no criminal history.

12            Judge, I am going to ask the Court to set a

13   personal surety bond to be signed by all the people here

14   in court, Judge.  That is what I am going to ask that you

15   do.

16            In the alternative, I ask that the Court set a

17   high personal surety bond coupled with a $50,000.00

18   corporate surety bond.

19            THE COURT:  Does anyone present in court who you

20   are suggesting co-sign on the bond have any property?

21            MR. ESPINOSA:  Yes.  His fiancée's father, Mr.

22   Mathis, has property.

23            THE COURT:  Which is --

24            MR. ESPINOSA:  Does anybody else own a home?

25            He is willing to sign, Judge.

69

1          THE COURT:  What is the equity in the property?

2          MR. ESPINOSA:  Can I have him come up here,

3    Judge?

4          THE COURT:  Why don't you just ask him.  I

5    don't --

6        (Mr. Espinosa and Mr. Mathis conferring off the

7    record.)

8          MR. ESPINOSA:  55,000, Judge.

9          THE COURT:  Anything else?

10         MR. ESPINOSA:  I have a favor to ask of the

11   Court.

12         THE COURT:  Which is?

13         MR. ESPINOSA:  Can you call Judge -- can you

14   have your secretary call Judge Victorio Platzer and tell

15   him that I am late.  I was supposed to start picking a

16   jury this afternoon.

17         THE COURT:  All right.  What is the telephone

18   number?

19         MR. ESPINOSA:  Judge, I don't know.

20         THE COURT:  Well, where is he?

21         MR. ESPINOSA:  In Dade County Circuit Court.  If

22   you call 547-0100 -- that is the State Attorney's

23   Office -- they will be able to give you the phone number

24   there also.

25         THE COURT:  All right.  We will do our best.

70

1           MR. ESPINOSA:  Okay.  Thank you.  I appreciate

2   it.

3           THE COURT:  Victorio Platts?

4           MR. ESPINOSA:  Victorio Platzer.

5           THE COURT:  P-l-a-t-z-e-r.

6           MR. ESPINOSA:  Right.

7           THE COURT:  Okay.

8           Mr. Dittoe, first of all, do you have any

9   rebuttal that you wish to offer?

10           MR. DITTOE:  No, Your Honor.

11           THE COURT:  Any argument?

12           MR. DITTOE:  Does the Court wish brief argument

13   or --

14           Your Honor, pretrial detention -- first of all,

15   the presumption applies because of the amount of narcotics

16   involved in this case.

17           Secondly, pretrial detention is warranted

18   primarily because of the substantial risk of danger to the

19   community.

20           Also, there is a substantial flight risk, given

21   the length of incarceration that the defendant would be

22   facing in the event of conviction.

23           With respect to the Defendant Shawn Dixon, he

24   would be facing, if convicted, 87 kilograms of cocaine,

25   which would translate to a Level 36 offense.  So, he would

1  be facing a substantial period of incarceration.

2          The highest drug offense would be a Level 38.

3  So, he is next to the highest narcotics offense just based

4  upon that importation.

5          So, there is a real -- even though there are

6  substantial ties, there is a danger of a flight risk.

7          But the real heart of the reason the Government

8  is requesting pretrial detention is because of the

9  indications of danger to the community.

10         And the Title 3 intercept on May 25th clearly

11  indicates an intention by the Defendant Booker to hurt

12  individuals -- eliminate people, take care of them -- said

13  in a way that the most reasonable inference is that there

14  are acts of violence that are going to be committed.

15         The evidence would further indicate that Shawn

16  Dixon works for and with Booker in the importation.  So,

17  you then find Shawn Dixon at the time of his arrest in

18  possession of a Tech-9.

19         And while it is true it is not illegal in and of

20  itself to possess a Tech-9, nevertheless, it is also true

21  that narcotics traffickers possess weapons in order to

22  facilitate their business of narcotics trafficking.

23         And here was a Tech-9, not just in and of itself

24  being loaded, but there were two additional clips found in

25  the closet where the Tech-9 was located.

72

1        As I said, but for the presence of the Tech-9,

2   the Government would not be moving for pretrial detention

3   on Shawn Dixon.

4        But the key fact, again, is the tape-recorded

5   conversation indicating that Mr. Booker could have taken

6   everyone out in one meeting and could eliminate the

7   m-f'ers.  I believe a reasonable inference is that is

8   intending toward acts of violence.

9        And the Government has established that by clear

10  and convincing evidence, the clear and convincing evidence

11  being Mr. Booker's own words recorded on the Title 3

12  conversations.

13       And so, while it is true Mr. Booker voluntarily

14  surrendered, it is equally true that there are these

15  threats and acts of violence, and that poses a danger to

16  the community, and the United States respectfully requests

17  pretrial detention on that basis.

18       THE COURT:  All right.  Anything else?

19       MR. DITTOE:  Not on behalf of the Government,

20  Your Honor.

21       THE COURT:  All right.  The Court finds as to

22  both defendants, given the presumption which exists as to

23  danger and risk of flight, that the presumption of risk of

24  flight has been rebutted by both defendants based on their

25  ties to the community.

1          And I am satisfied that Mr. Dixon's ties to

2    England are so attenuated that they don't rise to the

3    level of risk of flight.

4          However, there has been nothing at this point to

5    rebut the presumption of danger.

6          Therefore, as to both defendants, the Court will

7    find that the Government has met its burden of showing

8    danger to the community, as to Mr. Booker based on the

9    charges in the indictment together with the wiretap

10   transcript which has been read into the record, as to Mr.

11   Dixon based on the allegations together with the firearm.

12         However, I recognize that wiretap cases are

13   complicated, and I recognize that I am operating with an

14   isolated transcript that has been presented.

15         Therefore, after discovery has been received, if

16   the proffer as to the level of involvement of these two

17   defendants or the interpretation of the wiretap

18   transcripts changes the picture in any way, of course I

19   will always reconsider.

20         But at this point the Court finds that the

21   burden has been met as to both.

22         Okay.  I guess they haven't been arraigned.

23   So --

24         MR. WILCOX:  I have got an indictment, Your

25   Honor.  I don't know if they were arraigned or not, but I

74

1  already have a copy of the indictment.

2         THE COURT:  All right.  Go ahead.

3         MR. WILCOX:  Your Honor, we waive further

4  reading of the indictment.  We would enter -- on behalf of

5  Mr. Booker, I would waive further reading of the

6  indictment.  I would enter a plea of not guilty, request

7  trial by jury, and respectfully ask the Court to enter the

8  standing discovery order.

9         THE COURT:  All right.  Has Mr. Booker seen the

10  indictment?

11         MR. WILCOX:  Yes, he has, Judge.

12         THE COURT:  All right.  A not guilty plea will

13  be entered into the record, as will a demand for jury

14  trial.  The standing discovery order will be issued today.

15         MR. ESPINOSA:  Judge, I have one more matter I

16  would like to just address with regards to the bond.

17         THE COURT:  Yes.

18         MR. ESPINOSA:  I was just informed by my client

19  and his fiancée that it is not a Tech-9 that he owned.  It

20  was an AP-9.  It is a different type of weapon.

21         THE COURT:  What is the difference?

22         MR. ESPINOSA:  Judge, I think it is a big

23  difference as far as how they look.

24         MR. DITTOE:  Your Honor, we have the photographs

25  of the weapon.  I don't think there is a substantial

75

1    difference.  The --

2              THE COURT:  Let me see the photograph, and that

3    will --

4              I take it this is a semiautomatic.

5              MR. DITTOE:  Yes, Your Honor.  It is not fully

6    automatic.  We checked.

7              THE COURT:  I know you weren't alleging that,

8    but it is --

9              All right.  I will note the correction in the

10   record.  It doesn't change my ruling.

11             MR. ESPINOSA:  Okay, Judge.

12             THE COURT:  If anything, the photograph kind of

13   clinches it.

14             MR. ESPINOSA:  Okay.

15             THE COURT:  All right.  Can we arraign him?

16             MR. ESPINOSA:  Yes.  With regards to the

17   arraignment, I already reviewed -- excuse me, Your Honor.

18        (Mr. Espinosa and Defendant Dixon conferring off the

19   record.)

20        (Electronic recording temporarily paused.)

21             The only other thing that my client wanted me to

22   inform the Court was the fact that they did not find the

23   weapon in the house, that they asked him if he had any

24   weapons in the house, and he told them yes, that he had a

25   weapon in the house, and he volunteered that to the agents

76

1    or to the police officers.

2         So, I am making the Court aware of that at this

3    point in time.

4         THE COURT:  Okay.  As I say -- that will be

5    noted for the record as well.  This is early in the

6    proceedings, and if you can --

7         If you have an additional presentation that you

8    wish to make in terms of co-signatures and that sort of

9    thing or whether he can make some sort of corporate bond

10   or anything that changes on the facts, I will certainly

11   entertain that.

12        MR. ESPINOSA:  I appreciate that, Judge.

13        Now, with regards to the arraignment, I reviewed

14   the indictment with my client.  We waive formal reading.

15   We enter a plea of not guilty, demand trial by jury,

16   demand standing discovery in the case and time in which to

17   file motions.

18        THE COURT:  All right.  As to Mr. Dixon as well,

19   the not guilty plea will be entered into the record, as

20   will a demand for jury trial.  The standing discovery

21   order will be issued today.  And status will be April 6th

22   at 11:00 before me.

23        MR. WILCOX:  Your Honor, I beg the Court's

24   indulgence.

25        Your Honor, Mr. Dixon's father is in court --

77

1    Mr. Booker.  I apologize, Your Honor.  Mr. Booker's father

2    is in court, James Booker, Jr., and he wanted to say a few

3    words to the Court.

4            THE COURT:  I can't do that at this point.

5            MR. WILCOX:  I understand.

6            THE COURT:  I have ruled.

7            MR. WILCOX:  I understand, Your Honor.

8            THE COURT:  And if there is something that he

9    wants to present to the Court -- I can't do these things

10   little pieces at a time.  So, court is in recess.

11           MR. WILCOX:  Thank you, Your Honor.

12           THE CLERK:  All rise.

13       (Whereupon, the proceedings were concluded.)

14                       - - - - -

15

16

17

18

19

20       I HEREBY CERTIFY that the foregoing is a correct

21   transcript from the electronic sound recording of the

22   proceedings in the above-entitled matter.

23

24   _____    _____
         Transcriber                    Date

25

Accurate Reporting Services, Inc.
Third Floor
172 West Flagler Street
Miami, Florida  33130